# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| GARY B. GEASLIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:07CV1210 SNLJ/AGF |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Gary B. Geaslin was not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed and that the case be remanded for further consideration.

Plaintiff, who was born on July 13, 1960, filed for disability benefits on January 4, 2006, claiming a disability onset date of June 6, 2005, at the age of 44, due to a ruptured disc, arthritis, and bone deterioration. (Tr. at 122.) After his application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Such a hearing was held on November 7, 2006, at which Plaintiff and a

vocational expert ("VE") testified. The ALJ found that Plaintiff could not return to his former work, but could perform certain sedentary jobs identified by the VE, and was thus not disabled. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 30, 2007. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, Plaintiff argues that in assessing Plaintiff's residual functional capacity ("RFC"), the ALJ improperly relied upon the opinion of a non-medical consultant; erred in determining that the receipt of unemployment benefits by Plaintiff was inconsistent with his allegations of disability; and erred in relying upon the testimony of the VE, because the jobs identified by the VE were not within Plaintiff's region. Plaintiff requests that the decision of the Commissioner be reversed to award benefits, or that the case be remanded for further evaluation.

**Work History**

The record shows that Plaintiff worked full time as a general laborer from 1980 to 1991, as a delivery man for an appliance store from 1989 to 1994, and as a grounds and maintenance worker from 1995 to June 6, 2005. Id. at 145-146. Earnings records show that in the last 15 years that he worked, Plaintiff earned between approximately $12,000 and $19,000 a year, with minimal earnings in 1995 and 1999, and no earnings in 1991. Id. at 85-86. The record includes a letter of resignation dated June 6, 2005. Id. at 112.

2

**Medical Record**

The record indicates that orthopedist Richard Pearson, M.D., provided medical care to Plaintiff between January 30, 2004, and September 1, 2006. Id. at 175. In a report dated January 30, 2004, Dr. Pearson noted Plaintiff's loss of normal lordotic curvature of the cervical spine and mild degenerative spurring encroachment on the intervertebral foramen to the right at C5-6 and C6-6 levels. Id. at 177A.

On December 11, 2005, Plaintiff sought emergency care at a medical center for a cyst on his back. Id. at 185-197. An MRI of Plaintiff's cervical spine conducted on January 18, 2006, showed minimal disc bulges at C3-C4, C5-C6, and C6-C7; and narrowed disc spaces at C5-C6 and C6-C7. It was noted that the disc bulges caused no appreciable encroachment on the thecal sac, that there was no spinal stenosis, and that the vertebral bone marrow signals and spinal cord were normal. Id. at 200. A summary of an MRI of Plaintiff's lumbar spine conducted on January 30, 2006, stated as follows: "Neural recess narrowing and foraminal narrowing seen bilaterally at L4-L5 and L5-S1 due to posterior lateral disc protrusion. The rest of the lumbar spine is unremarkable. No significant central spinal stenosis is seen at any level." Id. at 199.

Notes dated February 9, 2006, and signed by William Robinson, M.D., state: "Note from work. Off duty from work . . . lumbosacral spine disease and stenosis . . . patient needs cervical collar . . . on pain medicine." Dr. Robinson gave Plaintiff prescriptions for medications including Motrin and Ultran for pain. Id. at 182.

On March 25, 2006, a state agency "Disability Examiner," M. Marchi,[1] completed a Physical RFC Assessment form indicating in check-box format that Plaintiff could lift and/or carry up to 20 pounds occasionally and up to ten pounds frequently; stand and/or walk for a total of six hours in an eight-hour day; and sit, with normal breaks, for about six hours in an eight-hour day. Ms. Marchi indicated that Plaintiff's ability to push and/or pull was unlimited, and that he had no postural (e.g., climbing and balancing), manipulative, visual, communicative, or environmental limitations. Id. at 132-37.

On June 29, 2006, Dr. Pearson wrote a note that Plaintiff was under his care for herniated discs at C5-C6 and C6-C7, and that Plaintiff could not work for six months. Id. at 181. In another note dated July 26, 2006, Dr. Pearson stated that Plaintiff complained of lower back pain which "went into" both legs, present for five years. Dr. Pearson wrote that Plaintiff had a history of "well documented" cervical disc herniation at C-5 and C-6 and was currently having a recurrence of symptoms, and that there was no evidence of progressive neurological deficit. Examination revealed "limitation of motion with pain at the extremes of motion." Dr. Pearson attributed Plaintiff's low back symptoms to "probable degenerative lumbar disk disease, facet hypertrophy, and lateral nerve root entrapment." Dr. Pearson expressed doubt that Plaintiff would "be able to participate in any activities which require[d] any lifting, bending, squatting or prolonged weight bearing for at least 6 months." Id. at 180.

---

[1] Ms. Marchi's married surname is Parham, a name which appears in the record (Tr. at 33-34) as an employee of the state disability determinations agency.

On September 1, 2006, Dr. Pearson reported that an MRI of Plaintiff's lumbar spine showed "a lumbar nerve root compression and disk protrusion at L4/5 and L5/S1." Id. at 177. Treatment notes dated October 3, 2006, note Plaintiff's complaints of pain in both legs, trouble sleeping at night, depression, and trouble breathing. Plaintiff was diagnosed with neuropathy, radiculopathy (disorder of the spinal nerve roots), low back pain, neck pain, anxiety, and insomnia. It was noted that Plaintiff was (or that he reported that he was) "unable to work x 1 year -½." Plaintiff medications were listed as Novartin (the notation for this drug is difficult to read), Lexapro (an anti-depressant), and Ambien (a sleep aid). Id. at 173-74. Dave Rengachary, M.D., reported that an electrodiagnostic study was conducted on October 6, 2006, due to Plaintiff's complaints of leg pain (right greater than left) and arm pain (left greater than right) "of many years duration," and that results of the study were normal. Id. at 165-68.

**Evidentiary Hearing of November 7, 2006**

Plaintiff, who lived in Ste. Genevieve, Missouri, testified that he was 46 years old, had completed "maybe" a half year of 11th grade, and had attempted to take the GED examination to no avail due to his inability to read and spell well enough. Plaintiff was wearing a foam neck brace at the hearing, which he stated he wore to provide stability for his neck. He testified that he began wearing the brace in January (2006) and continued wearing it for four months, but that at the time of the hearing he was only wearing it when he drove or left his home. Plaintiff testified that he had worked in maintenance,

5

appliance delivery, and as a laborer. His last job, at which he had worked for ten years, was in maintenance and ended on June 6, 2005, after which he collected unemployment benefits for six months. Id. at 210-13.

Plaintiff testified that he had not had any surgery for his neck or back, although he stated that he had spoken with a surgeon a "few years back" who proposed placing a rod through Plaintiff's neck and back. Plaintiff testified to having constant neck stiffness and sharp pain that radiated to his shoulders and into both arms, as well as almost constant pain from a sciatic nerve that "pinche[d]" his right leg. Id. at 215.

Plaintiff stated that he had not looked for light work following his last employment because he could not lift even light things due to the pressure it put on his neck and lower back. He testified that he could sometimes lift a gallon of milk, although sometimes he even had trouble with that. He also stated that he had been diagnosed (by Dr. Susan O'Donnell) with rheumatoid arthritis following a blood test. Plaintiff stated that other than his medical problems, not having an education was the reason he was not seeking employment. Id. at 216-17.

Upon examination by his attorney, Plaintiff stated that he had been taking Hydrocodone daily for the past five or six months, and that it made him dizzy and caused him to lose his balance. He was also taking something for his "nerves," a muscle relaxer, a sleeping aid, and Lexapro, which had been prescribed about 30 days prior to the hearing. Plaintiff testified that he had an appointment with a counselor the day after the hearing because he was depressed. He described a dispute with his ex-wife over custody

of his two daughters, ages 17 and 15, who were currently living with his sister.  Plaintiff testified that he had thought about suicide about a year ago, would cry about once every other week for about 20 minutes, and was sad about not being able to be with and take care of his children.  Id. at 217-22.

Plaintiff testified that a friend helped him fill out his medications list and "all that."  He testified that he had had trouble throughout his school years, was "passed on F's," and left school in the middle of 11th grade because he knew he would not graduate.  "I'm not retarded, but I still can't grasp on how to spell and write properly."  Reading was also difficult for him; he would try to read a children's books, but would come across words he did know and would stop.  He talked about his desire and efforts to get a GED, which he just could not do.  Id. at 222-24.

Plaintiff testified that he could no longer do things with his children that he used to do, such as sled riding, playing basketball, and bike riding.  His right leg "pinched" him every day, and he could only sit for about 20 or 30 minutes at a time before having to get up and move around.  Standing in one place, walking, and bending to pick something up also caused him problems with his leg and neck.  Besides the neck surgery that had been suggested by Dr. Pearson, another doctor recently told him that he needed back surgery, but that it would be hard to find a surgeon who would accept Plaintiff's Medicaid.  Plaintiff testified that his sister drove him to the hearing, and that he did not drive himself because pressing on the gas pedal caused pain in his right leg.  He did drive periodically to the store, a distance of about 15 miles.  Plaintiff testified that he took two to four naps

a day, each for about an hour or two, and that his sleepiness was due to the effects of his medications. Id. at 226-32.

The ALJ then asked Plaintiff whether he had ever been under the care of a psychiatrist or psychologist, and Plaintiff replied that he had not. Plaintiff further stated that when he worked at his maintenance job, he was able to follow instructions on how to replace things with new products. Id. at 333-34.

The ALJ then posed a hypothetical question to the VE, which "[came] . . . from the State doctors." The ALJ asked whether an individual with Plaintiff's vocational factors (age, education, and past work experience) who could lift and carry up to 20 pounds occasionally and ten pounds frequently; sit, stand, or walk for six out of eight hours; and stoop and crouch occasionally, could do Plaintiff past work. The VE responded in the negative, but added that there were other jobs the individual could do, such as light janitorial work and assembly line work. The VE further testified that there were about 25,000 janitorial jobs, some of which were medium and some of which were light, in the St. Louis metropolitan area; and about 25,000 assembly jobs in that area. She explained that jobs in the St. Louis area comprised about one-half of the jobs in the state, and about one-fortieth to one-fiftieth of the jobs in the nation. The VE testified that the need for a sit/stand option would preclude the jobs she had identified. Id. at 235-37.

Upon questioning by Plaintiff's counsel, the VE stated that the need to take two or three one-hour naps during the day would preclude all jobs. The VE clarified that if the ALJ were to find Plaintiff's testimony credible with regard to being limited to sitting 20

to 30 minutes at a time, "limited walking -- limited standing," and needing to change positions frequently, there would be no sedentary jobs Plaintiff could perform. The ALJ also testified that the ability to perform the jobs she had identified (janitor and assembler) would not be affected by the limited education and reading, comprehension, and writing skills testified to by Plaintiff. The VE confirmed that the jobs she had discussed were in the metropolitan St. Louis area, and not in the of Ste. Genevieve, Missouri area (approximately 65 miles away), where Plaintiff lived. Id. at 236-39.

The ALJ denied Plaintiff's counsel's request for a consultative psychological examination and IQ test "based on [Plaintiff's] testimony." The ALJ stated that this should have been asked for "before," and that there was no basis in the record, other than Plaintiff's testimony, of any psychological problems. Id. at 240.

**ALJ's Decision of January 4, 2007**

The ALJ found that Plaintiff's degenerative disc disease of the cervical and lumbar spine would significantly limit Plaintiff's ability to do basic work activities, and were thus "severe" impairments as that term is defined by the Commissioner's regulations. The ALJ found, however, that Plaintiff's alleged side effects of dizziness and fatigue from his pain medications, and his alleged depression were not severe impairments. According to the ALJ, the objective medical record did not show persistent and adverse side effects for the pain medication, or any ongoing mental-health treatment or psychiatric hospitalization since the alleged onset date. Rather, according to the ALJ, Plaintiff's social functioning,

9

activities of daily living, and concentration, persistence, or pace were no more than mildly impaired by Plaintiff's depressive condition. Id. at 13.

The ALJ concluded that Plaintiff had the RFC to perform work that involved lifting no more than 20 pounds at a time and no more than ten pounds frequently, standing no more than six hours and sitting no more than six hours during a normal eight-hour workday, and only occasional stooping and crouching. The ALJ recognized that Plaintiff alleged greater physical restrictions, but the ALJ found that this was not supported by "the objective medical documentation," which showed no prescribed assistive device for walking, no significant atrophy or loss of muscle tone, normal neurological functioning (referencing Dr. Rengachary's October 6, 2006 report), and no imposition by a treating physician of significant mental or physical limitations upon Plaintiff's functional activities for 12 consecutive months. Id. at 15.

The ALJ believed that Plaintiff's poor earnings record undermined "his credibility with regards to his allegations of disabling symptoms and his overall motivation to work." The ALJ noted that if received, Plaintiff's benefit amount would be $8,782.80 annually, an amount comparable to his average income for the past eleven years. Furthermore, the ALJ believed that Plaintiff's receipt of unemployment benefits for six months after he stopped working on June 6, 2005, was inconsistent with his allegation that he was disabled since that date. Id. at 16.

Dr. Pearson's opinion of June 29, 2006, that Plaintiff could not do certain work-related activities "for at least six months," indicated to the ALJ that the 12-month

10

durational requirement for establishing a disability was not satisfied. In addition, the ALJ stated that Dr. Pearson's opinion was not supported by the record as a whole, pointing to the normal neurological findings, the lack of the need for surgery or prolonged hospitalization, and the receipt of unemployment benefits.

The ALJ concluded that Plaintiff was unable to perform his past relevant work, which required a greater lifting ability than Plaintiff was capable of. But, based upon the VE's testimony, the ALJ found that Plaintiff could perform janitorial work and assembly line work, work which existed in significant numbers in the "local economy," and that Plaintiff was thus, not disabled.

## **DISCUSSION**

### **Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have

11

supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

An individual is disabled within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

> [A]n individual . . . shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423(d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the

claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). In evaluating the severity of mental impairments, the ALJ must make specific findings as to the degree of limitation in each of the following functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix 1. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular exertional category of work (heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-

13

based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain and depression, the Commissioner cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE.

In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE that there are jobs a person with the claimant's limitations could perform must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).

**ALJ's Assessment of Plaintiff's RFC**

Plaintiff argues that in assessing Plaintiff's RFC, the ALJ improperly relied upon the RFC assessment of Ms. Marchi. The Court agrees. A disability claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v.

Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001)). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here the ALJ did not do so. It is undisputed that Ms. Marchi was not a medical source. The record does not contain a medical opinion as to how Plaintiff's impairments affect his abilities to function, and the ALJ may not draw upon his own inferences from medical reports. See Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). As such, the ALJ's opinion cannot be affirmed. See Bowman v. Barnhart, 310 F.3d 1080, 1085 (8th Cir. 2002); Lauer, 245 F.3d at 706; Nevland, 204 F.3d at 858.

The Court does not believe, however, that the record supports Plaintiff's request for remand with an order that the Commissioner award benefits. See, e.g, Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 2002) (stating that the reviewing court should enter an immediate finding of disability only if the record "overwhelmingly supports" such a finding). Plaintiff is correct that the ALJ erred in stating that there was no evidence of

any nerve root compression.  As noted above, Dr. Pearson reported on September 1, 2006, that an MRI showed lumbar nerve root compression.  But the Court does not believe that the record as a whole overwhelmingly supports a finding of disability.  Accordingly, remand is warranted for further development of the record and consideration by the ALJ.  See Bowman, 310 F.3d at 1085 (reversing and remanding case for further development of the record and consideration where the ALJ relied on the RFC assessment of a state non-examining medical consultant); Lauer, 245 F.3d at 706 (same).

In reconsidering Plaintiff's RFC on remand, Plaintiff's mental and physical impairments must be considered in combination.  See 20 C.F.R. § 404.1523; Social Security Ruling 96-8p, 1996 WL 374184, at *5 (when assessing an individual's RFC, the ALJ "must consider an individual's impairments, even those that are not 'severe'"; when considered in combination, "the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do"); Cunningham v. Apfel, 222 F.3d 496, 501(8th Cir. 2000) (holding that the ALJ must consider "the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling").

The ALJ should also consider the need to develop the record with respect to Plaintiff's work-related functional limitations due to mental, as well as physical, impairments.  See Lauer, 245 F.3d at 706 (citing Nevland, 204 F.3d at 857 (stating that it

is well-settled that it is the duty of the ALJ to fully and fairly develop the record, even when the claimant is represented by counsel)).

**<u>Existence of a Significant Number of Jobs that Plaintiff Could Perform</u>**

Plaintiff also argues that the ALJ improperly relied on the VE's testimony because the VE did not specifically identify jobs within reasonable proximity to where Plaintiff lived. As this is an issue which may arise on remand, the Court will address it briefly. The Commissioner's regulations provide at follows:

> Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications. Isolated jobs that exist only in very limited numbers in relatively few locations outside of the region where you live are not considered "work which exists in the national economy". We will not deny you disability benefits on the basis of the existence of these kinds of jobs.

20 C.F.R. § 404.1566(b).

In <u>Johnson v. Chater</u>, 108 F.3d 178, 180 & n.3 (8th Cir. 1997), the Eighth Circuit essentially rejected a "reasonable proximity" standard (holding that 200 positions as an addresser or document preparer -- a sedentary, unskilled job -- in Iowa and 10,000 nationally was a significant number of positions; finding "unpersuasive" a case holding that 200-250 jobs spread across Colorado was not a significant number; and a case holding that 1,000 jobs in Michigan, all of which would require at least 180 miles of travel to get to, was not a significant number). Rather, application of the "significant number" requirement is left to the court's "common sense," with factors for the court to consider including "the level of the claimant's disability, the reliability of both the

claimant's and the VE's testimony, and the types and availability of work that the claimant could perform." Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997) (citing Jenkins v. Bowen, 861 F.2d 1083, 1087 (8th Cir. 1988). Here, the Court concludes that the existence of 25,000 sedentary assembly jobs in the St. Louis area would satisfy the "significant number" requirement, in light of the ALJ's testimony that this number represented about one-half of such jobs in Missouri.

**Unemployment Benefits**

As noted above, the ALJ believed that Plaintiff's receipt of unemployment benefits after the alleged onset date was a factor cutting against Plaintiff's credibility. Petitioner argues that this was error and that the receipt of unemployment benefits does not necessarily preclude a finding of disability. This is also an issue which may arise on remand. Accordingly the court notes that "[a]pplying for unemployment benefits may be some evidence, though not conclusive, to negate a claim of disability." Johnson v. Chater, 108 F.3d 178, 180-81 (8th Cir. 1997).

## CONCLUSION

The Court concludes that the Commissioner's decision that Plaintiff was not disabled was not based upon substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** for further consideration consistent with this Report and Recommendation.

The parties are advised they have ten (10) days, to and including September 23, 2008, to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

／s／ Audrey G. Fleissig
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 9th day of September, 2008.